983 F.2d 1057
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Mohammed F. AZEEM, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Muhammed Z. MANNAN, Defendant-Appellant.
 Nos. 92-5319, 92-5320.
 United States Court of Appeals,
Fourth Circuit.
 Argued: October 28, 1992
Decided: January 14, 1993
 
 Appeals from the United States District Court for the District of Maryland, at Baltimore. John R. Hargrove, District Judge. (CR-91-132-HAR)
 H. Elliot Wales, for Appellants.
 Lawrence G. McDade, Assistant Director, Office of Consumer Litigation, UNITED STATES DEPARTMENT OF JUSTICE, for Appellee.
 Milton A. Bass, Jacob Laufer, BASS & ULLMAN, for Appellant Azeem.
 Raymond A. Bonner, Assistant United States Attorney, for Appellee.
 D.Md.
 AFFIRMED.
 Before MURNAGHAN, NIEMEYER, and HAMILTON, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 Mohammed Azeem and Muhammed Mannan were indicted by a federal grand jury on charges of making false statements to the Food and Drug Administration (FDA) during the generic drug approval process (Counts 2 and 3) and of conspiring to make such statements (Count 1). On February 12, 1992, Azeem was convicted on all three counts and Mannan on counts 1 and 3. Not limited by the Sentencing Guidelines because of the dates of the offenses, the district judge sentenced Azeem to three years for each count, running concurrently, andmMannan to four months in a work release center. Both have appealed their convictions and sentences. A plethora of issues has ensued.
 
 
 2
 Superpharm Corporation developed, manufactured, and sold generic drugs, chemical copies of innovator or brand name drug products. After the patent on a new drug has expired, other pharmaceutical firms can market generic versions of that drug, on demonstration to the FDA, in an Abbreviated New Drug Application (ANDA), that the product with respect to which representation has been made will be bioequivalent to the original product. Bioequivalence is demonstrated through a series of tests in the laboratory and on human subjects. In addition, the company making application must demonstrate manufacturing expertise, as evidenced by its research, records, and test results.
 
 
 3
 Mohammed Azeem and Muhammed Mannan were Superpharm employees. Azeem was Vice President of the Corporation and was responsible for all technical services, including Research, Product Development, and Regulatory Affairs. Near the end of his employment by Superpharm, Azeem was absent from work for many weeks due to illness and a kidney transplant. He was hospitalized from late February to late March 1986. After that time, he initially returned to work on a limited schedule. Then, in July 1986, he was dismissed along with his subordinate Liaquat Hossain.
 
 
 4
 Shortly before his completion of graduate degrees in pharmaceutical marketing,[1] Mannan began employment in February 1985 as a technician in Superpharm's Research and Development Department under the direction of Liaquat Hossain (the government's key witness). He was responsible for manufacturing pilot batches utilizing formulas given to him by Hossain; he also prepared batch records submitted to the FDA in support of ANDAs and maintained inventory cards showing raw material usage.
 
 
 5
 The evidence supporting the indictment against Azeem and Mannan focused on Superpharm testing and ANDA submission of five generic drugs: diazepam, ibuprofen, lorazepam, hydralazine, and propranol. The government also introduced evidence, pursuant to Federal Rule of Evidence 404(b), relating to other generic drug products not specified in the indictment, but developed by Azeem prior to Mannan's involvement. Since Azeem and Mannan have challenged the sufficiency of the evidence presented, we must look at the specific, alleged actions taken by them.
 
 DIAZEPAM (supporting Count 1-conspiracy)
 
 6
 On July 11, 1985, Superpharm submitted ANDAs, signed by Azeem, for three separate strengths of Diazepam (brand name "Valium"). A production batch record for pilot batches of each strength was submitted with the ANDA; each trial batch had a weight of 3.2 kg. Based on its policy of only accepting pilot batches between approximately 10 and 300 kg, the FDA would not accept the data supporting the ANDA and mailed Superpharm a deficiency letter explaining that fact.
 
 
 7
 Testifying pursuant to a plea agreement, Hossain told the jury that, after receiving the deficiency letter, Azeem directed him to produce new batch records, using the same lot numbers as before and altering the batch size to roughly 10 kilograms. Hossain expressed concern that the FDA would notice the inconsistency, but Azeem indicated that he would take care of it. Hossain passed Azeem's order on to Mannan, in whose handwriting the fraudulent batch records were created. The only material difference between the two sets of records, one of 3.2 kg and one purporting to be of 10 kgs, was the stated batch size. Tripling the batch size in the original batch records, Mannan filled out new records indicating that a 9.6 kg batch size was involved even though he had not, and could not,[2] produce batches of that size. On November 1, 1985, Azeem submitted the three fraudulent batch records to the FDA.
 
 
 8
 Also in connection with Diazepam, Mannan prepared a handwritten, raw material inventory card. Even though Mannan did not begin employment until February of 1985, his initial entries were dated prior to that time. Inventory cards are required by law for controlled substances and subject to audit by the DEA. The government contended that Mannan falsified entries on the card in order that the raw material withdrawals would comport with the fraudulent large batch records he created at the direction of Azeem and Hossain.
 
 IBUPROFEN (supporting Count I-conspiracy)
 
 9
 Superpharm submitted an ANDA, signed by Azeem, for Ibuprofen (brand name "Motrin") on September 6, 1985. In response, the FDA mailed a deficiency letter, noting the absence of accelerated stability data. On November 4, 1985, Azeem replied by submitting a stability data summary indicating passing tests had been conducted on three lots in April, May, June, and July of 1985.
 
 
 10
 Hossain, however, testified at trial that Azeem again had submitted falsified information to the FDA, backdating stability test results. The chemist conducting the stability studies on Ibuprofen, Roberto Batuigas, did not begin testing the lot represented in Azeem's summary until July 18, 1985 and finished in September.
 
 LORAZEPAM (supporting Count I-conspiracy)
 
 11
 On April 26, 1986, Superpharm submitted an ANDA, signed by Azeem, for Lorazepam (brand name "Ativan") together with a summary of dissolution data. The submitted data, however, varied from the actual test results recorded in Superpharm chemists' notebooks. Hossain testified that the accepted practice at Superpharm was for the chemists to delete the outlying numbers and substitute the average number in their place, then to recalculate the average, standard deviation, and coefficient of variance. He further testified that Azeem was aware of and indirectly encouraged that practice.
 
 
 12
 HYDRALAZINE HYDROCHLORIDE AND HYDROCHLOROTHIAZIDE (Count II)
 
 
 13
 On May 20, 1985, Superpharm submitted an ANDA, signed by Azeem, for Hydralazine Hydrochloride and Hydrochlorothiazide (brand name "Apresazide"). The FDA responded in March of 1986 with a deficiency letter requesting dissolution data for the Hydralazine component of the drug. On June 24, 1986, Azeem replied with a summary of dissolution data on Research and Development lot # 140185. However, according to Superpharm Chemist Mohammed Momen, the data submitted was generated by a different lot (# 070486). Hossain testified that Azeem directed him to put lot number 140185 on the data generated by 070486. Given the differences in the formulation of the two lots, their dissolution rates would differ and therefore the data submitted was represented falsely to the FDA.
 
 PROPRANOLOL HYDROCHLORIDE (Count III)
 
 14
 On September 12, 1986, Superpharm submitted an ANDA, signed by Joan Hurd, who temporarily replaced Azeem as Regulatory Manager after he left, for Propranolol Hydrochloride (brand name "Inderal"). Hurd submitted with the ANDA documentation prepared by Azeem, Hossain, and Mannan while Azeem was in charge of all Research and Design at Superpharm. Included in that information was a manufacturing batch record for lot # 01285 prepared by Hossain and Mannan at the direction of Azeem. Written in Mannan's handwriting, the record indicated that the lot was manufactured on November 28, 1985, the batch size was 10 kg/100,000 tablets, and the tablets were orange in color. Again, however, the batch records appeared fraudulent.
 
 
 15
 The lot number indicated on the batch record had previously been used for a different batch of propranolol, a lot consisting of 3 kg/25,000 tablets and of blue tablets. That batch was used in a human subject bioequivalence study conducted by a Canadian research laboratory in 1985 for Superpharm. After receiving the results from Canada, Mannan noted to Hossain that the blue tablet designation was inappropriate because the innovator drug was orange. Hossain passed the information on to Azeem, who then directed Hossain to make a batch of orange tablets.
 
 
 16
 Hossain and Mannan prepared a batch of 30,000 orange tablets, recorded their activities, and reported to Azeem. Azeem then directed Hossain to prepare a batch record for the FDA reflecting the manufacture of a batch of 100,000 orange tablets. Although Hossain and Mannan never prepared a batch of that size, Mannan nevertheless prepared the false 100,000 tablet batch record.
 
 
 17
 A federal grand jury in the District of Maryland returned a three count indictment charging Azeem and Mannan with conspiracy to make false statements to the FDA in violation of 18 U.S.C. § 371 (Count 1) and with making false statements to the FDA, in violation of 18 U.S.C. § 1001 (Counts 2 and 3). Based on knowledge of Azeem's and Mannan's activities, Superpharm pled guilty to charges of violating FDA regulations and paid a fine of $1 million.[3]
 
 
 18
 After his indictment, Mannan and his attorney were interviewed by the prosecution team, including FDA agent Charles Zielinski and Assistant U.S. Attorney Raymond Bonner. During the interview, Bonner advised Mannan that he did not have to answer questions, could terminate the interview at any time, and could speak to his counsel at any time. At trial, Zielinski testified that Mannan admitted, in the course of the interview, that the batch records he prepared "were prepared at a later time in that the dates and times were-not accurate in all respects" and that inventory cards were not always accurate. According to Zielinski, Mannan further acknowledged that he prepared the inflated batch record for Diazepam, even though "he knew that it was wrong, but that he was only following instructions."
 
 
 19
 Mannan also testified at trial, contesting Zielinski's presentation of the post-indictment discussion. Azeem, however, did not testify at trial. On appeal, he claims he did not testify because the district judge refused his in limine motion that the government be precluded from using his 1990 conviction[4] to impeach him in the event that he testified. He made no commitment to testify if the motion were granted nor did he offer proof as to what his testimony would be. The district judge denied Azeem's motion.
 
 
 20
 On February 12, 1992, after an eight-day jury trial, Azeem was convicted on all three counts and Mannan was convicted on counts one and three. Because the illegal activities took place between 1983 and 1986 and the Sentencing Guidelines only took effect on November 1, 1987, the district court was not bound by the Guidelines. After a sentencing hearing, the district judge sentenced Azeem to be imprisoned for a term of three years for each of the three counts, with the terms running concurrently. Mannan was sentenced to four months in a work release center.
 
 
 21
 Azeem and Mannan have contended that the government failed to produce sufficient evidence to convict them. In reviewing the sufficiency of evidence in a case, we must
 
 
 22
 inquire whether "any rational trier of fact could have found the essential elements of the crime [charged] beyond a rea sonable doubt," and ... construe the evidence in the light most favorable to the government, assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, however adduced.
 
 
 23
 United States v. Giunta, 925 F.2d 758, 764 (4th Cir. 1991) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Therefore, in considering the appellants' argument, we are not to reweigh the evidence or to reconsider the credibility of the witnesses. See Glasser v. United States, 315 U.S. 60, 80 (1942).
 
 
 24
 A reviewing court is limited to a consideration of whether the evidence offered by the government has surpassed a minimum threshold. Circumstantial evidence may suffice to support a verdict of guilty on the substantive charges, United States v. Colclough, 549 F.2d 937, 942 (4th Cir. 1977), United States v. George, 568 F.2d 1064, 1069 (4th Cir. 1978), and to prove the existence of a common purpose and plan with respect to the conspiracy charge. See Glasser, 315 U.S. at 80; Giunta, 925 F.2d at 764.
 
 
 25
 Even the uncorroborated testimony of one witness may be sufficient to sustain a verdict of guilty on the charges. United States v. Arrington, 719 F.2d 701, 705 (4th Cir. 1983), cert. denied, 465 U.S. 1028 (1984); United States v. Manbeck, 744 F.2d 360, 392 (4th Cir. 1984), cert. denied, 469 U.S. 1217 (1985) (" ... uncorroborated testimony of an accomplice may be sufficient to sustain a conviction.").
 
 
 26
 The jury could have reasonably inferred that a conspiracy existed and that Azeem and Mannan knowingly and willingly participated in the conspiracy and that they intentionally committed substantive violations.
 
 
 27
 The brief on behalf of Azeem has made a perfunctory sufficiency argument, relying on Azeem's illness in the spring of 1986 to challenge a finding of criminal intent. Such a defense fails on several grounds: (1) the described fraudulent activities occurred while Azeem was well or recovered; (2) Hossain testified that he was in daily contact with Azeem during Azeem's illness and that Azeem continued to make ANDA decisions; and (3) the government introduced evidence that Azeem was being paid for work completed for another firm during the time period when he alleges that he was too sick to concentrate on his work at Superpharm.
 
 
 28
 Passing the questionable validity of Azeem's illness defense, the evidence presented by the government was sufficient to support a jury finding of guilt as to Azeem. Hossain's testimony, standing alone, was sufficient to support a finding of the requisite elements of the charged crimes and to sustain the conviction. Moreover, the government introduced direct evidence showing a personal involvement by Azeem in the fraudulent activities of Superpharm. Viewing the testimonial and physical evidence in the light most favorable to the government, assuming its credibility, drawing all favorable inferences from it, and taking into account all the evidence, however adduced, a rational trier of fact could have reached the verdict challenged here.
 
 
 29
 In the case of Mannan, his challenge to the sufficiency of the evidence presented against him boils down to a facile claim: he was the "low man on the totem pole" simply following orders.[5] Even if he was acting at the direction of others without thinking about the meaning of his actions, he, as the one who acted, remained responsible for his deeds. See, e.g., United States v. North, 910 F.2d 843, 880-881 (D.C. Cir. 1990), cert. denied, U.S., 111 S.Ct. 2235 (1991) ("[O]ur criminal justice system, one based on individual accountability and responsibility, has historically recoiled" from a"following orders" or "Nuremberg" defense.)
 
 
 30
 As with Azeem, the testimony of Hossain was sufficient to support a finding of guilt of Mannan on both the conspiracy charge and the substantive charge. Furthermore, the evidence of Mannan's specific activities (such as filling out batch records for fictional batches), his knowledge of the field, and his statements to FDA agent Charles Zielinski are proof of guilt.
 
 
 31
 Mannan has contended that his testimony, in which he maintained that he knew nothing about the fraudulent nature of the test data, should outweigh the testimonial and physical evidence presented by the government. Such an argument may be successful at trial but, failing before a jury, it cannot survive appellate scrutiny, for "it is the role of the factfinder, not the appellate court, to resolve conflicts in testimony, weigh the evidence, and judge the credibility of witnesses." United States v. Manbeck, 744 F.2d at 392.
 
 
 32
 According to Glasser and Giunta, a rational trier of fact could have found substantial evidence to convict Mannan both for conspiring with Hossain and Azeem to submit falsified documents to the FDA and for falsifying documents that were submitted to the FDA.
 
 
 33
 Azeem has challenged the sentence imposed on him on the grounds that the district judge, when deciding the sentence, erroneously considered Azeem to be a recidivist.[6] Our review of the sentencing decision is limited to ascertaining whether the sentence is legally permissible and whether the judge abused his discretion. United States v. Noland, 510 F.2d 1093, 1096 (4th Cir. 1975). The actual sentence was well within the statutory maximum of five years for each count. Azeem was sentenced to only three years imprisonment with the possibility of parole.[7]
 
 
 34
 Although the government did not claim that Azeem was a recidivist and the district judge knew that Azeem's earlier conviction stemmed from later activity, the district judge did mention Azeem's 1990 conviction when reprimanding Azeem after the sentencing hearing. He had been the judge in Azeem's 1990 trial and had given him a light sentence based on Azeem's ill health and claim of general good behavior.
 
 
 35
 At Azeem's 1992 sentencing, the district judge began by stating the assigned sentence and explaining that he felt such a sentence was required in light of Azeem's role in the conspiracy, his education and background, the seriousness of the charges, and the potential impact on public health of falsified ANDAs. However, he went on to explain that had he been aware in 1990 of Azeem's falsification of ANDAs and batch records, he would not have been so lenient on Azeem in 1990. Essentially, he castigated Azeem for his continuous bad behavior.
 
 
 36
 In order to accept Azeem's claim that the district judge abused his discretion in sentencing, we would have to conclude incorrectly that a reproachment mentioning past convictions which could not be considered in determining the sentencing amounted to reversible error. Such a conclusion seems unwarranted. Neither precedent nor equity would appear to require that all extraneous comments by a trial judge to a defendant must be forbidden though sentencing falls strictly within legal guidelines. See, e.g., United States v. Bakker, 924 F.2d 728, 740 (4th Cir. 1991) ("As the community's spokesperson, a judge can lecture a defendant as a lesson to that defendant and as a deterrent to others.").
 
 
 37
 Moreover, the sentence imposed was minimal (three years total) and does not reflect inappropriate bias against Azeem. Therefore, his sentence should not be reversed.
 
 
 38
 Azeem moved to preclude the government from using his 1990 conviction for bribing an FDA official to impeach him in the event that he should testify. He did not commit to testify if the motion were granted and did not offer proof as to the content of his planned testimony. The district court denied his motion. Azeem did not testify at trial.
 
 
 39
 On appeal, Azeem has challenged the district court's ruling as an abuse of discretion and has claimed that it amounted to reversible error because he was precluded from testifying as a result and thereby significantly prejudiced.
 
 
 40
 Since Azeem did not testify and has still not proffered the content of his testimony, any possible harm arising from the district court's refusal to grant his motion is purely speculative. In order to prevent such speculation, the Supreme Court has concluded that in order to preserve for review an attempt to preclude impeachment by a prior conviction, a defendant must testify. Luce v. United States, 469 U.S. 38, 43 (1984) ("We hold that to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify."). Therefore, Azeem's claim is lacking in merit.
 
 
 41
 For the first time on appeal, Mannan[8] has challenged the district judge's instructions regarding the law of conspiracy, particularly the standard for determining membership in a conspiracy. The conspiracy instruction given at trial was derived from a legal reference book-Sand, Siffert, Laughlin and Reiss, Modern Federal Jury Instructions, Criminal Volume I, Chapter 19.
 
 
 42
 Rule 30 of the Federal Rules of Criminal Procedure requires that a party object to a jury instruction prior to retirement by the jury to consider its verdict and that the grounds of the objection be stated on the record. When the adequacy of jury instructions has not been challenged at trial a showing of plain error is required. United States v. Venneri, 736 F.2d 995, 996-997 (4th Cir.), cert. denied, 469 U.S. 1035 (1984); United States v. Marsh, 894 F.2d 1035, 1039 (9th Cir. 1989), cert. denied, 493 U.S. 1083 (1990). The United States Supreme Court explained that "[i]t is the rare case in which an improper jury instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Henderson v. Kibbe, 431 U.S. 145, 154 (1976).[9]
 
 
 43
 Mannan and Azeem, consequently, had to demonstrate that the conspiracy instruction was so significant a misstatement of law as to constitute plain error. "An appraisal of the significance of an error in the instructions to the jury requires a comparison of the instructions which were actually given with those that should have been given." Id. In the present case, the district judge instructed the jury that
 
 
 44
 In order to establish the offense of conspiracy the Government must prove three essential elements. First, that the alleged conspiracy existed; second, that the defendants knowingly and intentionally became members of the conspiracy; and that an overt act was knowingly and intentionally committed in furtherance of the conspiracy. Now a conspiracy is a combination of two or more persons to accomplish an unlawful act. It is a kind of partnership in criminal purpose in which each member becomes the agent of each other, of each member. The gist or essence of the offense is a combination or mutual agreement by two or more persons to disobey or disregard the law. And a conspiracy may be established even if-if its purpose was not accomplished. In determining whether the alleged conspiracy existed, you may consider the actions and statements of all of the alleged participants.
 
 
 45
 The evidence in the case need not show that the alleged members of the conspiracy entered into any express or formal agreement. The agreement to conspire may be inferred from all of the circumstances and the conduct of the alleged participants. In determining whether the defendants became a member of the conspiracy, you may consider the actions and statements of all of the alleged participants. To be a member of the conspiracy the defendant need not join at the beginning or know all the other members or the means by which the purpose was to be accomplished. The extent of the defendant's participation moreover is not determinative of ones guilt or innocence, that one may be found to be a member of the alleged conspiracy even though they may have played only a minor part in the conspiracy. The Government must prove beyond a reasonable doubt that they knew or were-or was aware of the common purpose and was a willing participant.
 
 
 46
 Since the instruction is not erroneous as a matter of law, Mannan has claimed that the district judge's failure to give further instructions on specific points of conspiracy law amounts to plain error. On its face, such a claim is unlikely to succeed under the plain error standard. It is almost always the case that, if further jury directions had been requested, they could have been given in order to clarify points of law. Yet we do not and cannot expect the trial judge sua sponte to give long-winded and quite possibly confusing explanations of fine points of law in the jury instruction. If the judge adequately and correctly states the relevant legal considerations, he or she has not committed plain error. Plain error would only be present if the trial judge failed to include jury guidelines that are well-accepted or prescribed by precedent.
 
 
 47
 The additions argued for by Mannan are neither well-accepted nor dictated by case law. They merely represent clarifications on the issue of what constitutes membership. However, the district judge's instruction adequately and correctly explained how the jury should determine whether a defendant was a culpable participant in a conspiracy. Accordingly, Mannan and Azeem have failed to demonstrate that the district judge committed plain error.
 
 
 48
 Next we consider Mannan's claim that the jury instructions should have included a statement that the jury "must first look to the act or declarations of Mannan himself, before they could look at the declarations and acts of the others[,]" because the jury must find an act relating to Mannan before it can find him to be a member of the conspiracy. Mannan has offered no case law or logic to support his argument. In fact, such a specific statement would be superfluous in light of the district judge's inclusion of an instruction that the government had to prove beyond a reasonable doubt that each defendant was a willing and knowing participant. For the jury to find that one is a participant, certainly it must conclude that one committed an act relating to the conspiracy.
 
 
 49
 Mannan, on appeal, likewise has asserted that the district judge should have told the jury that association with conspirators does not amount to participation in the conspiracy. Again, such an instruction was not necessary nor legally required. In fact, the Ninth Circuit has concluded that failure to include a mere association instruction does not rise to plain error. United States v. Marsh, 894 F.2d at 1039.
 
 
 50
 Finally, Mannan has claimed, on appeal, that since he did not have any contact with Azeem, he could not be convicted of conspiring with Azeem and that the failure of the district judge to give an instruction to that effect was plain error. But such an instruction would run counter to well-established conspiracy law that alleged coconspirators need not know each other in order to be members of the same conspiracy. See, e.g., Blumenthal v. United States, 332 U.S. 539, 556-557 (1947).
 
 
 51
 At trial, the government, acting pursuant to Rule 404(b) of the Federal Rules of Evidence, introduced evidence of false statements made by Azeem to the FDA regarding generic drugs not included in the indictment. While not challenging the admissibility of the evidence, Azeem has argued that the district judge, by failing to give special jury instructions regarding the 404(b) evidence, committed reversible error. Azeem, however, did not request such a jury instruction at trial; therefore, we have a basis for reversing his conviction on those grounds only if the failure to give a 404(b) instruction amounted to plain error and produced substantial jury prejudice.
 
 
 52
 First, Azeem has offered no case law that supports his argument. He has contended that such an instruction was necessary to avoid prejudice; but, he has not proved that the evidence was likely to prejudice the jury nor that its prejudicial effect outweighed its probative value. We have consistently held that the prejudice that Rule 403 was designed to prevent is jury emotionalism and that business records do not generally cause such irrational reactions. United States v. Greenwood, 796 F.2d 49, 53 (4th Cir. 1986). The evidence submitted by the government-ANDAs and batch records-was not likely to arouse jury fervor.
 
 
 53
 Even if an instruction had been necessary, the failure to give it was not determinative of the jury's verdict. The evidence presented against Azeem was extensive and the introduction of 404(b) evidence without a special explanation was not prejudicial.
 
 
 54
 At last, Mannan has claimed that his trial attorney committed errors so egregious that he was denied the effective assistance of counsel and, but for the ineffectiveness, there is a reasonable probability that he would have been acquitted. He has based his claim on two alleged errors. First, Mannan has argued that by not getting an immunity letter to cover any statement made during an interview with the prosecution, the attorney forced him to waive his right against selfincrimination and testify on his own behalf to counter the statements he made during the interview (and introduced into evidence through the testimony of FDA agent Charles Zielinski). He has also alleged that his counsel failed to submit jury instructions or to object to omissions in the Court's charge to the jury.
 
 
 55
 The Fourth Circuit has a rule against hearing claims of ineffective assistance of counsel on direct appeal. See, e.g., United States v. Lurz, 666 F.2d 69, 78 (4th Cir. 1981), cert. denied, 455 U.S. 1005, 457 U.S. 1136, 459 U.S. 843 (1982). The reasoning behind the court's refusal is that the record on the issue is incomplete on direct appeal because the counsel accused of error has not had an opportunity in an adversary proceeding to explain his or her actions at trial.
 
 
 56
 The Fourth Circuit's rule does not work injustice, moreover, as it permits review on direct appeal when the record is so replete with error by counsel that the defendant need not wait for collateral proceedings to obtain relief. "It may be ... that where it conclusively appears in the trial record itself that the defendant was not provided on trial effective representation, the Court will consider the matter on appeal without requiring the defendant to resort to a Section 2255 hearing." United States v. Mandello, 426 F.2d 1021, 1023 (4th Cir. 1970).
 
 
 57
 However, the alleged mistakes by Mannan's trial counsel are not so replete and obvious. The decision not to obtain immunization for a discussion with the government about a possible plea arrangement may be justified on various grounds: tactical, government's likely refusal, etc. The questions regarding why counsel made that decision "can more properly be inquired into in a Section 2255 proceeding." Id. Likewise, the attorney did not commit clear error with respect to jury instructions. Indeed, Mannan's trial counsel submitted lengthy jury instructions to the judge. While he did not challenge the jury instructions on conspiracy, the judge's instructions were legally accurate.
 
 
 58
 In light of the foregoing determinations, the judgments as to both defendants are
 
 
 59
 AFFIRMED.
 
 
 
 [1]
 Mannan earned Masters of Science in Industrial Pharmacy and in Marketing Management in June of 1985
 
 
 [2]
 The blending equipment available at that time in Superpharm's Research and Development Department in creation of pilot batches had a maximum capacity of only 5 kg
 
 
 [3]
 Superpharm is now defunct
 
 
 [4]
 He had been convicted for giving an unlawful gratuity to a federal employee (an FDA employee) and for interstate travel in aid of racketeering
 
 
 [5]
 His brief goes so far as to describe him as an automaton, performing tasks without thinking or interacting with others
 
 
 [6]
 In 1987, Azeem had committed another crime-bribery of a government officer-for which he was convicted in 1990. However, Azeem bribed an FDA official after he directed the falsification of records at Superpharm (1983-1986). In order to be considered a recidivist during sentencing, a defendant must have committed further illegalities after serving a prison term. Here, the additional illicit acts occurred prior to any conviction or sentence
 
 
 [7]
 Since the illicit acts took place between 1983 and 1986, Azeem was not sentenced under the Sentencing Guidelines. The Sentencing Guidelines, if applicable, would require incarceration of 46 to 57 months for each charge and do not allow the possibility of parole
 
 
 [8]
 Both challenge the instructions, yet they concede that the question is relevant mostly for Mannan
 
 
 [9]
 The Henderson Court cited Namet v. United States, 373 U.S. 179, 190 (1963), which "characterized appellate consideration of a trial court error which was not obviously prejudicial and which the defense did not mention during the trial as 'extravagant protection.' " Henderson, 431 U.S. at 154 n. 12